# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| SHEENA LEIGH HICKMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-00097 |
| | ) | Chief Judge Crenshaw/Brown |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(I) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 13) be **GRANTED IN PART and DENIED IN PART**, and that the Commissioner's decision be **REMANDED** for the Administrative Law Judge (ALJ) to conduct a proper credibility assessment, and reconsider his disability determination based on that reassessment.

## I. PROCEDURAL HISTORY[1]

Plaintiff filed applications for DIB and SSI on June 17, 2013, alleging a disability onset date of January 15, 2012 in both instances. Plaintiff alleged disability due to vision problems in both

---

[1] The procedural history below is adopted from the jurisdiction and procedural history section of the ALJ's decision (Doc. 10, p. 12), unless indicated otherwise. References to page numbers in the administrative record are to the page numbers that appear in bold in the lower right corner of each page.

eyes and a learning disorder.  (Doc. 10, pp. 131, 133, 262)  Both claims were denied initially on

October 31, 2013, and upon reconsideration on February 28, 2014.  (Doc. 10, pp. 100-01, 143-46)

Plaintiff requested a hearing before an ALJ on April 30, 2014.  A hearing was held before

ALJ Marty Turner on September 29, 2015.  (Doc. 10, pp. 27-69)  Plaintiff was represented at the

hearing by attorney Jane Jennings.  (Doc. 10, p. 28)  Charles Wheeler, an impartial vocational expert

(VE), testified at the hearing.  (Doc. 10, pp. 28)

The ALJ entered an unfavorable decision on October 30, 2015 (Doc. 10, pp. 9-26), after

which plaintiff filed a request with the Appeals Council on December 3, 2015 to review the ALJ's

decision (Doc. 10, pp. 7-8).  The Appeals Council denied plaintiff's request on October 4, 2016.

(Doc. 10, pp. 1-6)

Plaintiff brought this action through counsel on November 2, 2016 (Doc. 1), following which

she filed a motion for judgment on the administrative record on February 13, 2017 (Doc. 13).  The

Commissioner responded in opposition on March 13, 2017.  (Doc. 14)  Plaintiff did not reply.  This

matter is now properly before the court.

## II.  EVIDENCE[2]

### A.  Documentary Evidence

Dr. Bonnie Taylor, O.D., completed an Eye Report for Children with Visual Problems on

August 8, 1994 (Dr. Taylor's 1994 Eye Report or the 1994 Eye Report) (Doc. 10, p. 344) that was

referred to in a December 1, 1994 Functional Vision Report (the 1994 Vision Report) signed by

Nancy Murdock, "Certified Teacher of the Visually Impaired."[3]  (Doc. 10, pp. 341-43)  The 1994

---

[2]  The medical evidence and testimony at the hearing are discussed below to the extent that they are relevant
to plaintiff's claims of error.  The remainder of the medical record and testimony is incorporated herein by reference.

[3]  "Dr. Taylor's 1994 Eye Report" is referred to in the 1994 Vision Report, and Ms. Murdock's 2001 Vision
Report discussed below.  However, Dr. Taylor's actual records are not in the record of evidence before the court.

Vision Report attributes the following clinical observations to Dr. Taylor's 1994 Eye Report:

> S[h]eena has possible ocular albinism with nystagmism, astigmatism, and megalocornea.[4] . . . Albinism caused abnormal development of the central reading vision between 20/60 - 20/80 in both eyes. This means Sheena can see at a distance of 20 feet what a normal eye can see at 60 feet. A person with albinism has a severe sensitivity to light. Sheena also has nystagmus, an[] involuntary rapid movement of the eyeball and megalocornea which is an abnormality w[here] the front third of the eye is larger than normal.

(Doc. 10, p. 341) Noting that plaintiff's near vision was "20/50 6" [f]rom [her] eyes," Ms. Murdock summarized the results of the 1994 Vision Report as follows: "The results of the Functional Vision Assessment and eye report from Dr. Taylor certify Sheena as a visually impaired student." (Doc. 10, p. 342-43)

The Giles County High School records (the school records) are before the court for the period August 8, 1997 to May 29, 2003. (Doc. 10, pp. 220-56) These records include school progress reports (Doc. 10, pp. 220-46, 252-53, 255-56), an Observations–Impressions–Plan completed by the Southern College of Optometry(the Southern College of Optometry) on August 8, 1997 (Doc. 10, p. 247), sections I-IV and VI of a second Functional Vision Report dated April 16, 2001 (the 2001 Vision Report) signed by Ms. Murdock (Doc. 10, pp. 248-50), and a vision exam dated December 6, 2000 signed by Kelly White RN (otherwise unidentified) (Doc. 10, p. 251). The 2001 Vision Report notes that plaintiff's "vision has remained stable since" the first grade, that plaintiff "can see regular print when brought within 4-6" of her eyes," that she "needs to be allowed to tilt her head and move the materials to a comfortable position to provide her best focusing ability," but that she nevertheless had "an interest in the possibility of driving a car." (Doc. 10, p.

---

[4]  Ocular albinism – "albinism that affects primarily the eyes . . . characterized by reduced visual acuity . . . ." *Dorland's Illustrated Medical Dictionary*, 32 ed. 44 (2012). Astigmatism – "an error of refraction caused by unequal curvature of the refractive surfaces of the eye . . . ." *Dorland's* at p. 168.

> **Note:** The record shows that plaintiff went to work after high school cleaning tables at the Hickory House restaurant (the Hickory House) in 2004, and worked there through most of 2010. (Doc. 10, pp. 217-18) The record shows that plaintiff left the Hickory House in late 2010 to take a job with National Health Corporation (NHC) doing housekeeping and laundry, and that she remained with NHC until her employment was terminated in early 2012. (Doc. 10, p. 218)

Dr. Laura Orton, O.D., examined plaintiff in May 2013.[5] (Doc. 10, pp. 352-54) Dr. Orton reported on May 14, 2013 that plaintiff's last eye exam was "10 years [ago] in Columbia," but did not identify who performed the examination. (Doc. 10, p. 352) Dr. Orton characterized plaintiff's chief complaint on May 14 as "Vision blurred dist & near – has to turn head sideways to read or put make up on – OS[6] always bad OS moves back & forth – can't see to drive or watch TV." (Doc. 10, p. 352) The May 14 record indicates that Dr. Orton prescribed a "trial" contact lens for plaintiff's left eye. (Doc. 10, p. 352) Dr. Orton noted two weeks later on May 28, 2014 that "Pt reports vision better & CL [contact lens] comfortable OS very light sensitive [with] CL." (Doc. 10, p. 354)

Dr. Orton subsequently completed a Tennessee Department of Safety Vision Examination Form the following month on June 14, 2013 in connection with plaintiff's June 10, 2013 application for a Tennessee driver's license. (Doc. 10, pp. 355-57) Dr. Orton reported that plaintiff wore

---

[5] A Disability Report completed June 21, 2013 is before the court. (Doc. 10, pp. 261-67) Plaintiff lists Dr. Orton as one of only two health care professionals who had treated her, but that she had seen Dr. Orton only in *May 2013* when Dr. Orton administered a vision test and "applied [a] contact" lens. (Doc. 10, § 8.C, p. 265)(bold omitted) The report lists Dr. Stephen Savage, M.D., as the other heath care professional who had treated her. (Doc. 10, § 8.D, p. 266)(bold omitted) Dr. Savage's treatment records do not go to plaintiff's alleged disabling conditions.

[6] OS – "L. oculus sinister (left eye)." *Dorland's* at p. 2119. Other vision-related abbreviations in this R&R include: OD – "L. Oculus dexter (right eye)," and OU – L. Oculus uterque (each eye)." *Dorland's* at p. 2119. Other sources clarify OU to mean "both eyes . . . ." http://optometry.nova.edu/ce/tpacc/forms/opth_abbreviations.pdf.

contacts, she "can't see near or far vision," she had "poor night vision," her best possible corrected vision was 20/70 in her right eye, 20/60 in her left eye, and 20/60 with both eyes, that other treatments would not "improve [the] . . . described conditions for [her] eyes," and that plaintiff was not "currently undergoing . . . treatment to improve [her] vision." (Doc. 10, p. 355)

Michael Loftin, Ph.D., examined plaintiff consultively on September 24, 2013. (Doc. 10, pp. 358-63) No records were available during the examination. (Doc. 10, p. 358) Dr Loftin recorded the following subjective observations:

> [Ms. Hickman] appears able to follow instructions; both written and spoken. . . . She showed . . . poor basic math skills. She was able to complete simple addition, subtraction, and multiplication, but not division, tasks in her head. She showed a good capacity for abstract thinking and understanding. . . . Ms. Hickman states that she manages her finances with little or no difficulty.

(Doc. 10, pp. 361-62) Dr. Loftin diagnosed plaintiff with a mathematics disorder and borderline intellectual functioning. (Doc. 10, p. 363)

Plaintiff's attorney referred her to Douglas Mays, Ed.D., who examined plaintiff on August 26 and September 2, 2015. (Doc. 10, pp. 367-86) Dr. May's diagnostic impression was that plaintiff suffered an "Intellectual Disability." (Doc. 10, p. 375) Dr. Mays also made the following additional observation regarding plaintiff's vision:

> Her visual impairment certainly adds to the practical problems she would encounter establishing and sustaining meaningful employment. I would encourage the reader to visualize any particular job Ms. Hickman could attempt to perform, given her level of training and education; which would allow her to routinely place her eyes between four and six inches of given visual material. For those jobs which could be performed using this particular coping skill; for which of these does Ms. Hickman possess the requisite cognitive and academic skills to meaningfully complete them? It is my sense that the convergence of this woman's intellectual, cognitive processing, achievement, and visual impairments sum to exclude an answer which points to any category of traditional, meaningful and sustained

employment.

(Doc. 10, p. 375) Dr. Mays concurred in Dr. Loftin's mathematics disorder diagnosis. (Doc. 10, p. 371) The ALJ gave "significant weight" to Dr. Mays' opinion pertaining to his psychological evaluation, but gave "no weight" to his vision-related opinion. (Doc. 10, p. 18)

Betsy Booth, plaintiff's former co-worker, sent an email to plaintiff's attorney on August 31, 2015 in which she wrote the following:

> I was employed at the Hickory House Restaurant . . . for 16 years. . . . During that time I worked with Sheena Hickman for about six or seven years. Sheena . . . struggle[d] daily because of her disabilities. She was very slow and had a hard time seeing out of one eye. We would have to go behind her to clean tables that she already had cleaned or remove silverware that she had put on peoples tables that were still dirty. . . .

(Doc. 10, p. 327)

## B. Testimonial Evidence

### 1. Witness Testimony

Plaintiff testified at the hearing upon questioning by the ALJ that: she was fired from NHC because she was too slow and unable to clock in and out using the computer (Doc. 10, pp. 34-35); she had never had a driver's license because she was unable to pass the vision test (Doc. 10, p. 36); her grandmother and cousin drove her wherever she needed to go (Doc. 10, p. 36); she could not tell time using a digital clock if it were too small (Doc. 10, p. 38); she was unable to tell time using an analog clock (Doc. 10, p. 38); her brother and cousin took her to the drag races "every other weekend" (Doc. 10, p. 45); her cousin accompanied her when she walked in the neighborhood, but she did not walk in the neighborhood alone (Doc. 10, p. 46); she could use a cell phone if the telephone numbers had been pre-programmed (Doc. 10, p. 47).

Plaintiff testified upon questioning by counsel that: she could not look at a clock and tell that

she had 20 minutes to get somewhere (Doc. 10, p. 38); she "wasn't getting the rooms cleaned" at NHC "because [she] didn't see the dirt they did" and she "was too slow" (Doc. 10, p. 39); when she tried to clean for an aunt, she had "to go back over what [she] was doing" because she was "missing spots" (Doc. 10, p. 39); when she worked at the Hickory House she was "having to go back over the tables or the other employe[e]s were going back over them" (Doc. 10, p. 40); she had sit at "arm's length" from the television to watch it (Doc. 10, pp. 40-41); she had to "get real close to see" a computer (Doc. 10, p. 41); her grandmother had to read her medication labels to her, or they were kept in "an eight print label box" (Doc. 10, p. 41); she was unable to read the labels in her clothes or recipes on the back of a box (Doc. 10, p. 42); she was unable to tell if someone gave her the correct change (Doc. 10, p. 42); she was unable to see to sew a button (Doc. 10, p. 43); her grandmother had to read her mail for her (Doc. 10, p. 44); she could wash clothes but not iron them because she could not see the dial on the iron (Doc. 10, p. 44); she prepared her meals using a microwave because she could not see the controls on the stove (Doc. 10, p. 44).

Plaintiff's grandmother testified upon questioning by counsel that: she had to take plaintiff "everywhere" she went "unless [her] other grand daughter t[ook] her" (Doc. 10, p. 52); she had to read "any mail" that plaintiff received (Doc. 10, p. 52); she took plaintiff grocery shopping and helped her with her groceries "[a] lot of times" (Doc. 10, p. 52); plaintiff prepared everything in the microwave, and did not use the stove or oven because she might leave it on or put it on the wrong temperature (Doc. 10, p. 52); plaintiff required telephone reminders when she had to get ready to go somewhere (Doc. 10, p. 53); she had to help plaintiff determine the settings on the washing machine before she was able to use it on her own (Doc. 10, p. 54); plaintiff did not comprehend the meaning of things she read (Doc. 10, pp. 55-56); plaintiff had to sit 3-4 ft. from the television to see it (Doc. 10, p. 56); plaintiff did not see well enough to clean her house without suggestions or

reminders (Doc. 10, p. 58); plaintiff could use a cell phone if the were numbers pre-programmed (Doc. 10, p. 58).

## 2. The VE's Testimony

The VE testified initially that plaintiff's prior work included "laundry worker," Dictionary of Occupational Titles (DOT) 361.685-018, "cleaner," DOT 323.687-010, and "dining room attendant," DOT 311.677-018. (Doc. 10, p. 62) Thereafter, the ALJ posed the following hypothetical to the VE:

> I want you to assume a hypothetical person who has no exertional limitations. However, this individual is limited to work that does not require exposure to workplace hazards such as unprotected heights or exposure to dangerous moving machinery. The individual is limited to jobs that do not require the reading of small print and no jobs that require fine far acuity. The individual is limited to work where they can understand, remember, and carry out simple one to two step work instructions with occasional changes in the work setting. Now, given these restrictions, could this hypothetical person perform the claimant's past work?

(Doc. 10, pp. 62-63) The ALJ added that the hypothetical person could not work with "small objects," following which the VE testified that the hypothetical person could not perform plaintiff's past work. (Doc. 10, p. 63) The VE testified, however, that the hypothetical person could perform other work such as "cleaner housekeeping," DOT 323.687-014, "label coder," DOT 920.687-014, and "silver wrapper," DOT 318.687-018. (Doc. 10, pp. 63-64) The VE also testified that "there would be no work" if "the individual were to require close supervision and . . . need[ed] a supervisor to observe and redirect up to 20 percent of the work day in order to remain on task." (Doc. 10, p. 64)

Counsel cross-examined the VE on the following issues associated with the jobs he identified that plaintiff could perform: whether the housekeeper and cleaner "would . . . need to be able to read directions on cleaners . . . ." (Doc. 10, pp. 64-65); the required language and reading skills (Doc. 10,

p. 65); the required math skills (Doc. 10, pp. 65-66); the effect of learning disabilities if the employee were "unable to tell time and to calculate intervals of time" (Doc. 10, p. 66).

In closing, the ALJ asked the VE if his testimony "testimony [was] consistent with the Dictionary of Occupational Titles." (Doc. 10, p. 67) The VE replied, "Yes, your honor . . . ." (Doc. 10, p. 67)

## III. ANALYSIS

### A. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### B. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers

to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

### C. Claims of Error

### 1. Whether the ALJ Failed to Give Appropriate Weight to the Records of Plaintiff's Optometrists, School Testing and Psychological Findings (Doc. 13-1, pp. 6-10 of 18)

Plaintiff argues in her first claim of error that the ALJ failed to give the appropriate weight to the individuals and entities discussed below. More particularly, plaintiff argues that the records of those individuals and entities "qualify as treating sources and, as such should be given appropriate weight," *i.e.*, controlling weight. Title 20 C.F.R. § 404.1502 defines "treating source" as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical conditions(s). We may consider an acceptable medical source who has treated or evaluated you only a few times . . . to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). . . .

The ALJ is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). However, "this requirement only applies to treating sources." *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). The ALJ is not required to explain her reasons for the weight he gives to the opinion of other sources.

*See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6ᵗʰ Cir. 2012)("[A]n ALJ need only explain his reasons for rejecting a treating source statement because such an opinion carries 'controlling weight.'")(citing *Smith*, 482 F.3d at 876 ("[T]he SSA requires ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)).  That said,"the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning" as to other sources.[7] *Stacey v. Comm's of Soc. Sec.*, 451 Fed.Appx. 517, 519 (6ᵗʰ Cir. 2011).

### a.  Plaintiff's Impaired Vision Arguments

Plaintiff argues first that the school records "show . . . [she] must hold printed materials 4-6" from her face in order to see, [but] the ALJ disputed this fact and gave it no weight."[8]  (Doc. 13-1, p. 7 of 18)  The plaintiff misrepresents the record.  The ALJ gave "no weight" *only* to Dr. Mays' improper opinion, discussed below at pp. 15-16, concerning plaintiff's vision limitations – he did not give "no weight" to the school records in which this specific limitation appears.

Notwithstanding the foregoing, it cannot be determined from the decision whether the ALJ addressed this limitation, nor does the decision reflect whether he considered the school records in which that limitation is noted.  Nevertheless, the Sixth Circuit has held that "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party," *see Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6ᵗʰ Cir. 2006)(citation

---

[7] Title 20 C.F.R. § 416.927(e)(2)(ii) provides, in relevant part, that "[u]nless a treating source's opinion is given controlling weight, the administrative law judge **must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant** . . . ."  (emphasis added)  Social Security Ruling (SSR) 96-6P provides that, although "[a]dministrative law judges . . . are not bound by findings made by State agency . . . physicians and psychologists . . . they may not ignore these opinions and must explain the weight given to the opinions in their decisions."

[8] The undersigned notes here that evidence that predates the alleged disability onset date – between 8 ½ and 14 ½ years in the case of the school records at issue – is not necessarily irrelevant but, when "evaluated in combination with later evidence, may help establish disability."  *See DeBoard v. Comm'r of Soc. Sec.*, 211 Fed.Appx. 411, 414 (6ᵗʰ Cir. 2006)(italics and citation omitted).

omitted), "as long as h[is] . . . findings as a whole show that [h]e implicitly considered the record as a whole," *Rudd v. Comm's of Soc. Sec.*, 531 Fed.Appx. 719, 730 (6th Cir. 2013)(citing *Kornecky*, 167 Fed.Appx at 507-08). It may be inferred from the decision at step 2, *i.e.*, that plaintiff has a "severe . . . vision impairment" (Doc. 10, ¶ 3, p. 14), the ALJ "implicitly considered the record as a whole" as it pertained to plaintiff's vision limitations.

Plaintiff asserts in her second argument that Dr. Taylor's "report of her December 1, 1994 exam which revealed that [plaintiff's] near vision was 20/50 at 6" from her eyes (R. 342)" contradicts the ALJ's decision.[9] (Doc. 13-1, p. 7 of 18) Once again, the record does not reflect whether the ALJ considered this limitation in his decision, or whether he considered the report in which this limitation allegedly is noted. As explained above, however, it may be inferred from the ALJ's determination at step 2 that he "implicitly considered the record as a whole" as it pertained to plaintiff's severe vision limitations.

In addition to the foregoing, plaintiff has misrepresented the record once again. Although the "20/50-at-6"" limitation appears in the 1994 Vision Report, discussed above at pp. 2-3, the limitation appears in the "Optical Information" section of that report. (Doc. 10, ¶ V.A.1, p. 342) It does not appear in the "Source of Information," "Background," or "Definition of Eye Problem" sections attributable – all or in part – to Dr. Taylor. (Doc. 10 ¶¶ I.1, II, III, p. 341) More importantly, the limitation does not appear in Dr. Taylor's August 8, 1994 report on which both the 1994 Vision Report and plaintiff's argument appear to be based. (Doc. 10, p. 344)

The next question is whether Dr. Taylor should be considered a treating source. Except for

_____

[9] As discussed above at pp. 2-3, Dr. Taylor's Eye Exam was dated August 8, 1994. The 1994 Vision Report that was dated December 1, 1994.

the passing reference noted in n. 10 below,[10] the record is utterly silent as to Dr. Taylor.  Absent any proof of the requisite length, frequency, nature and extent of any doctor-patient relationship under § 404.1502, Dr. Taylor is not considered a treating physician within the meaning of § 404.1502 and, as such, her opinion is not entitled to controlling weight.

Finally, Dr. Taylor's August 1994 eye exam is not relevant to plaintiff's disability claim for reasons explained above at p. 11 n. 8.  More particularly, the eye exam was performed when plaintiff was scarcely 10 years of age, it was performed approximately 10 years before plaintiff worked for 7 years starting in 2004, it was performed approximately 17-plus years prior to the disability onset date, and it was performed 18 years 9-plus months before Dr. Orton fitted plaintiff with a corrective lens that made her vision "better."

Plaintiff's third argument is that Dr. Orton's reports contradict the ALJ's opinion.  However, plaintiff provides no factual allegations in support of this argument.  (Doc. 13-1, p. 6 of 18)  The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf").  Consequently, plaintiff's third argument is waived.  *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Plaintiff fourth argument refers to the 2001 Vision Report which she asserts "contain[s] an

---

[10]  The following comment appears in a report completed by the Southern College of Optometry dated August 8, 1997: "Referred Back to Dr. Bernie Taylor for CL Fit and monitoring of nearpoint complaints."  (Doc. 10, p. 247)  However, there are no other records attributable to Dr. Taylor that would support the conclusion that Dr. Taylor and plaintiff had a doctor-patient relationship.

eye report from the Southern College of Optometry revealing that [plaintiff] can see regular print when brought within 4-6" of her eyes and that she had to tilt her head to focus on the print (R. 251)." (Doc. 13-1, p. 7 of 18)  Again, the record does not reflect whether the ALJ considered this limitation in his decision, or whether he considered the record in which this limitation allegedly was noted. Here too, however, it may be inferred from the determination at step 2 that the ALJ "implicitly considered the record as a whole" as it pertained to plaintiff's severe vision limitations.

Plaintiff also misrepresents the record again.  The statement that constitutes plaintiff's argument appears in the "Education Implications and/or Unique Instructional Needs" section of the 2001 Vision Report and is not attributable to any individual or entity.  (Doc. 10, ¶ IV.2, p. 250)  The statement does not appear in the "Sources of Information," "Background," or "Recommendations" sections where the Southern College of Optometry is mentioned by name.  (Doc. 10, ¶¶ I.1, III, VI, pp. 248-50)[11]  Furthermore, p. 251 of the record, to which plaintiff refers specifically, is a report of visual screening and skills dated December 6, 2000.  However, there is nothing in the report that shows it was produced by the Southern College of Optometry, nor is there any reference in that report to the vision limitation at issue.

The only relevant reference to the Southern College of Optometry in the 2001 Vision Report is in the Recommendations section where Ms. Murdock wrote: "The results of the . . . eye report from [the] Southern College of Optometry certify Sheena is a visually impaired student . . . [with] . . . a distant visual acuity of 20/50 or less in the better eye after correction."  (Doc. 10, p. 248) Although it is unclear, the Southern College of Optometry report to which Ms. Murdock may be referring is an Observations – Impressions – Plan dated August 8, 1997 in which the following observations are recorded:

---

[11]  Paragraph V of the 2001 Vision Report is not in the record.

OD 20/80$^{+1}$
OS 20/60$^{-2}$
OU 20/50$^{-2}$

(Doc. 10, p. 247)  Although this report predates the 2001 Vision Report by 3 years 8-plus months, it does support – generally – what Ms. Murdock wrote in the "Recommendations" section of the 2001 Vision Report.  Once again, however, there is nothing in this report that refers to the distance and positional references that are the subject of this argument.

In addition to the foregoing, the 2001 Vision Report also is not relevant to plaintiff's disability claim.  The report predates the disability onset date by 10 years 9 months.  More importantly, it was written 12-plus years prior to Dr. Orton fitting plaintiff with a corrective lens that made her vision "better."

Referring to p. 368 in the record, plaintiff asserts in her fifth argument that Dr. Loftin observed that plaintiff had to "move 'very close to test materials in order to see them better.'"  (Doc. 13-1, p. 7 of 18)  Again, plaintiff misrepresents the record.[12]  Dr. Loftin made no such statement. (Doc. 10, pp. 358-63)  The following statement does appear on p. 368 to which plaintiff refers: "Her visual acuity problems were observable in the form of her moving very close to test materials in order to apparently see them better."  However, Dr. Mays made that statement in his report, not Dr. Loftin.

Finally, plaintiff asserts in her sixth argument that Dr. Mays' opinion contradicted the ALJ's decision.  The undersigned notes as an initial matter that plaintiff's counsel referred her to Dr. Mays to conduct a "psychological evaluation in conjunction with [plaintiff's] appeal for a disability determination."  (Doc. 10, p. 367)  Title 20, § 404.1527 provides in relevant part that:

---

[12]  This is the fourth time plaintiff has misstated the record.  Counsel has a duty to be accurate in stating the record.  Misstatements can seriously undermine counsel's credibility with the court.

> We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

In short, Dr. Mays' opinion was not entitled to the weight of a treating physician, *i.e.*, controlling weight, because he was a nontreating, examining source under the regulations. The next question is whether the ALJ "said "enough to allow the appellate court to trace the path of his reasoning."

The ALJ wrote the following in his decision regarding Dr. Mays' opinion about plaintiff's vision limitations:

> This latter portion of his opinion is assigned no weight. Dr. Mays is not an optometrist, a medical doctor or a vocational expert. He did not test claimant's vision. He is presuming that claimant can only see 4 to 6 inches in front of her . . . . As this portion of [Dr. Mays'] opinion does not relate to his expertise or his examination, it is not relevant.

(Doc. 10, p. 18) The ALJ's statement quoted above explains quite clearly why he gave "no weight" to Dr. Mays' vision-related opinion. Moreover, where a medical source offers an opinion outside his area of expertise, the ALJ does not err if he discredits that opinion. *See Gant v. Comm'r of Soc. Sec.*, 372 Fed.Appx. 582, 584-85 (6th Cir. 2010); *Adams v. Massanari*, 55 Fed.Appx. 279, 284 (6th Cir. 2003).

For the reasons stated above, plaintiff's vision-related arguments in support of her first claim of error are without merit or waived.

### b. Plaintiff's Borderline Intellectual Functioning

Plaintiff's second argument in her first claim of error is that the ALJ failed to give proper consideration to evidence of her borderline intellectual functioning. Plaintiff asserts specifically that the ALJ erred in determining that she did meet or equal the requirements for mental retardation

under 20 C.F.R. Pt. 404, Subpt. P . App. 1, § 12.05(C) at step 3 of the 5-step sequential process.

Judicial review of claims arising under the Act is available only after the Commissioner renders a "final decision" on the claimant's claim. *See Heckler v. Ringer*, 466 U.S. 602, 605-06 (1984); *Califano v. Sanders*, 430 U.S. 99, 108 (1977)(citations omitted). A claimant "receives a final decision . . . after he exhausts all administrative appeals of an adverse administrative determination." *See Giesse v. Sec. Health and Human Serv's*, 522 F.3d 697, 704 (6th Cir. 2008)(citing 42 U.S.C. § 1395-w-22(g); 42 C.F.R. § 422.560).

A plain reading of plaintiff's representative brief on appeal from the ALJ's unfavorable decision (Doc. 10, pp. 331-35) reveals that plaintiff did not raise this issue before the Appeals Counsel prior to raising it in these proceedings. Because plaintiff did not exhaust this argument in the proceedings below, the district court is without jurisdiction to consider it.

### 2. Whether the ALJ Made Credibility Findings That Were Not Based on a Fair and Accurate Reading of the Record as a Whole (Doc. 13-1, pp. 10-14 of 18)

Plaintiff asserts that the ALJ took the credibility evidence out of context, gave no reason for discounting the testimony of plaintiff and her grandmother, and did not mention the evidence submitted by Ms. Booth.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)(citation omitted). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Notwithstanding the foregoing, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed.Appx. 370, 371

(6th Cir. 2011)(quoting *Walters*, 127 F.3d at 531).

The ALJ's credibility assessment is quoted below for convenience of reference:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

> The claimant has provided inconsistent information regarding daily activities. During the hearing, the claimant denied her ability to perform a range of activities due to her vision problem. However, the claimant testified that she lives alone, watches[] television and utilizes a computer. She also reported that she goes shopping, goes on walks in her neighborhood, takes care of her pet and does the laundry. She also stated that she goes to drag races every weekend[,] goes to the mall, visits family, and makes phone calls on her phone (Exhibits 6E and Testimony).

> The claimant has alleged performing few, if any household chores. Yet it is noted that the claimant lives alone and has not reported any particular help in maintaining the residence. Additionally, during the hearing, the claimant's grandmother testified that she sees her granddaughter once a week and that the claimant cleans her own apartment (Testimony). This evidence suggests that the impairments may not be a[s] severe as alleged.

(Doc. 10, p. 19)

The evidence and testimony discussed above at pp. 2-8 show that plaintiff has significant vision and learning limitations. The ALJ's credibility assessment above presents a very distorted view of her ability to function. In short, the ALJ's conclusion that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible . . . ." is not supported by substantial evidence. Accordingly, the undersigned recommends that this matter be remanded for the ALJ to conduct a proper credibility assessment, and reconsider his disability determination based on that reassessment.

### 3.  Whether the VE's Testimony Was Flawed
### (Doc. 13-1, pp. 14-16 of 16)

Plaintiff makes two basic arguments in support of her third claim of error.  First, plaintiff argues that the ALJ erred in not including the following in his hypothetical to the VE: a) her "serious limitations in using numbers"; b) that she "cannot tell time"; c) the specifics of her severe vision impairments.  In her second argument, plaintiff asserts that the VE made the following errors in his testimony: d) that plaintiff could perform work as a "cleaner, housekeeper" and "silver wrapper," DOTs 323.687-014 and 318.687-018 respectively, because the requirements of these two jobs are almost identical to plaintiff's prior work which the VE testified plaintiff could no longer perform, *i.e.*, "cleaner" and "dining room attendant," DOTs 323.687-010 and 11.677-018 respectively; e) "[t]he third job identified by the [VE] was . . . 'label coder' which he identified by D.O.T. # 920.687-014 . . . [where] . . . [i]n reality the D.O.T. number given by the vocational expert is not linked to a label coder, but rather to a 'bagger' job."  (Doc. 13-1, p. 14-16 of 18)

Turning to plaintiff's first argument – a) through c) above – plaintiff argued before the Appeals Counsel that the ALJ erred because the "hypothetical question was based upon [plaintiff] having a high school education . . . ."  (Doc. 10, p. 332)  Plaintiff's argument in the proceedings below is not the same as her argument in these proceedings.  For the reasons explained above at p. 17, the district court does not have jurisdiction to consider this argument.

Turning to d) above, the record shows that plaintiff's counsel cross-examined the VE on the on the reading, language, and math skills required for the three positions he identified as work plaintiff could perform, and what the effect would be on the employment of an individual who was unable to calculate intervals of time.  However, counsel never cross-examined the VE on the alleged conflict with the respective DOTs, *i.e.*, that one's inability to perform work as a "cleaner" and "dining room attendant" precluded her from working as a "cleaner, housekeeper" and "silver

wrapper" because of the similarity of work.

Counsel is obligated to cross-examine the VE as to any conflicts with the DOT.  *See Beinlich v. Comm's of Soc. Sec.*, 345 Fed.Appx. 163, 168-69 (6th Cir. 2009)(citing *Ledford v. Astrue*, 311 Fed.Appx. 746, 757 (6th Cir. 2008)).  Relief on judicial review will not lie in the absence of such cross-examination.  *Beinlich*, 345 Fed.Appx. at 168-69 (citing *Ledford*, 311 Fed.Appx. at 757).  Having failed to cross-examine the VE on the conflict created by the alleged mutually exclusive nature of the DOTs at issue, plaintiff is not entitled to relief on these grounds.

Finally, turning to e) above, plaintiff's attorney did not cross-examine the VE on the alleged "label coder" versus "bagger" discrepancy at the hearing, nor did she raise this issue to the Appeals Counsel under the same theory as she raises her claim in these proceedings.  In her brief before the Appeals Counsel, plaintiff raised this issue in terms of her ability "to use setscrews, use a ruler, occasionally use tweezers and prepare label coding reports" which plaintiff argued would require "[r]easonably good vision . . . to perform."  (Doc. 10, p. 332)  Again, for the reasons previously explained above at p. 17, the district court is without jurisdiction to consider this argument.

For the reasons explained above, the district court may not consider plaintiff's arguments in support of her third claim of error for want of jurisdiction and failure to exhaust.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 13) be **GRANTED IN PART AND DENIED IN PART**, and that the Commissioner's decision be **REMANDED** to the Commissioner for the ALJ to conduct a proper credibility assessment, and reconsider his disability determination based on that reassessment.  The parties have fourteen (14) days of being served with a copy of this R&R to serve

and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

**ENTERED** this 5th day of December, 2017.

/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge